UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

v.                                                                                  Case No. 8:22-cr-145-TPB-AAS

RICHARD ALLEN RANDOLPH,

    Defendant.
_____/

**ORDER GRANTING GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE TESTIMONY OF DEFENSE EXPERT WITNESS DAVID FAIGMAN**

This matter is before the Court on the United States of America's "Motion in Limine to Preclude Testimony of Defense Expert Witness David Faigman," filed on March 15, 2024. (Doc. 76). Defendant Richard Allen Randolph filed a response in opposition on March 22, 2024. (Doc. 80). The Court held a hearing to address the motion on April 10, 2024, that included sworn testimony from the proposed expert witness. (Doc. 113). On April 12, 2024, the Court entered an order granting the Government's motion, indicating that a written order would follow. (Doc. 115). This Order memorializes and explains the Court's ruling. Upon review of the motion, response, argument, evidence, court file, and record, the Court finds as follows:

**Background**

This case involves four separate armed robberies that allegedly took place between January 27, 2020, and February 26, 2020, in Tampa, Florida. Based on these events, a federal grand jury returned an eight-count indictment against

Defendant: four counts related Hobbs Act robberies and four corresponding counts related to a firearm allegedly used in the course of the robberies.

In January and February of 2020, four local businesses were robbed: J-Lo Beauty Supply, Citgo Food Market, Annie Nails, and Family Dollar. Based on the circumstances, law enforcement suspected that one individual committed these four robberies. At each robbery, as confirmed by security videos, the individual entered the stores wearing a dark hoodie to disguise his face and gloves (in two of the robberies) to cover his hands. In all four of the robberies, the suspect used a firearm to threaten the store employees, and the individual actually discharged the firearm at least twice in the parking lot during the last robbery on February 26, 2020, at Family Dollar. Although the suspect fled, law enforcement recovered a .380 caliber spent casing and a projectile (bullet). The evidence was impounded and preserved. However, for a long time, law enforcement had no leads.

That changed in in July 2021, during a routine traffic stop in Collier County, Florida, when police seized a Pico Beretta .380 pistol from David Haggins.[1] When Haggins was questioned by law enforcement, he claimed that he received the firearm from Richard Allen Randolph. Police test-fired the Beretta and submitted images to the National Integrated Ballistic Information Network ("NIBIN") database, which compares images of ballistic evidence from shooting scenes to recovered firearms for possible matches. The submission generated a lead of a

---

[1] Collier County is roughly 150 miles from Tampa, Florida, the site of the robberies that took place in early 2020.

possible association with images submitted after the Family Dollar robbery on February 26, 2020, in Tampa.

The case agent submitted the recovered Beretta, projectile, and cartridge to the Bureau of Alcohol, Tobacco, Firearm, and Explosives Forensic Science Laboratory in Atlanta, Georgia, for examination. Andrew Pike, a firearm and toolmark examiner at the laboratory, examined the submission and concluded that the projectile and casing were fired from the Beretta. Specifically, he reported that "the probability that the toolmarks on [the projectile and casing] were made by a different source, other than [the Beretta], is so small that it is negligible." A second examiner then verified Pike's results. The Government intends to present Pike as an expert witness during its case in chief.[2]

To counter Pike's expected testimony, Defendant indicated his intent to present Dean David L. Faigman as an expert witness regarding the "foundational validity" and reliability of firearm and toolmark identification. The Government now seeks to exclude the testimony of Dean Faigman, arguing that his testimony is not relevant, but even if it were, any probative value would be substantially outweighed by the danger of confusion, misleading the jury, and unfair prejudice.

## Legal Standard

As recently revised, Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or

---

[2] On February 28, 2023, Defendant filed his "Motion in Limine to Exclude the Government's Firearm Identification Expert. (Doc. 41). The Court denied the motion on July 17, 2023. (Doc. 53). On March 21, 2024, Defendant filed his "Motion to Reconsider Ruling on Defendant's Motion in Limine to Exclude the Government's Firearm Identification Evidence" (Doc. 79), which was orally denied during the trial (Docs. 130; 136).

> otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (rev. eff. Dec. 1, 2023); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "The party offering the expert testimony bears the burden of establishing, by a preponderance of the evidence, the expert's qualification, reliability, and helpfulness." *Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 942 (11th Cir. 2015) (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc)).

Functioning as a gatekeeper, the district court plays an important role by ensuring that all expert testimony is reliable and relevant. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Although *Daubert* references specific factors for the district court to consider when evaluating relevance and reliability, the inquiry is a flexible one, focusing on the principles and methodology employed by the expert, not on the conclusions reached. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014); *see also Hanna v. Ward Mfg., Inc.,* 723 F. App'x 647, 649-50 (11th Cir. 2018) (outlining the criteria for the admissibility of expert witness testimony). At the same time, "conclusions and methodology are not entirely distinct from one another," and "[a] court may

conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The Eleventh Circuit has recognized that "[b]ecause of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403." *Frazier*, 387 F.3d at 1263 (internal citation omitted); *Edwards v. Shanley*, 580 F. App'x 816, 823 (11th Cir. 2014). In fact, due to the "talismanic significance" of expert testimony in the eyes of jurors, when exercising its important gatekeeping function, the district court "must take care to weigh the value of such evidence against its potential to mislead or confuse." *Frazier*, 387 F.3d at 1263.

## Analysis

Firearm toolmark identification methodology stems from the theory that every firearm leaves a unique mark on the bullets that pass through it due to random irregularities in firearm manufacturing. The Association of Firearm and Tool Mark Examiners ("AFTE") methodology requires examiners to subjectively compare the marks on different bullets for "sufficient agreement" to determine whether they came from the same firearm. *See United States v. Pete*, No. 3:22cr48-TKW, 2023 WL 4928523, at *1 (N.D. Fla. July 21, 2023). Specifically, the examiner test-fires the firearm in question to obtain a "test bullet" and then compares the features on the test bullet, which he knows came from the firearm, to the bullet recovered from a crime scene to determine whether that bullet came from the same firearm. If there is sufficient agreement, the firearm is considered a match to the recovered bullet. *See id.* In a typical case, a second examiner then independently

examines the evidence to verify the first examiner's results. When all is said and done, an examiner's conclusion that a particular firearm matches a particular bullet is subjective. *See United States v. Romero-Lobato*, 379 F. Supp. 3d 1111, 1116 (D. Nev. 2019) ("The AFTE itself recognizes that this method is inherently subjective.").

As the Court explained in a prior *Daubert* order in this case pertaining to Government expert witness Andrew Pike, courts have "generally allowed firearm examiners to testify, without many restrictions, that a bullet found at the scene of a crime was fired from a particular gun." *See id.* (citing David H. Kaye, *Firearm-Mark Evidence: Looking Back and Looking Ahead*, 68 CASE W. RES. L. REV. 723, 725-26 (2018)). This type of testimony has been accepted in state and federal courts throughout the country for the better part of a century. Jim Agar, *The Admissibility of Firearms and Toolmarks Expert Testimony in the Shadow of PCAST*, 74 BAYLOR L. REV. 93, 94 (2022).

But for the past twenty years or so, some academic commentators, scientists, and others have questioned the validity of various types of forensic evidence typically admitted in American criminal courts, including fingerprint comparisons, handwriting analyses, DNA identification, and firearms and toolmark identification. Among other things, this interest in firearm and toolmark identification, driven primarily by academic commentators, resulted in a report critical of various forensic sciences in 2016 from the President's Council of Advisors on Science and Technology that has come to be known as the "PCAST" report. Although this report was almost immediately rejected by the Department of Justice, in the wake of this criticism, some courts have questioned the AFTE methodology

and have imposed various limitations on firearms expert testimony.[3]  *See Romero-Lobato*, 379 F. Supp. 3d at 1116.  Yet, it appears that "courts that imposed limitations on firearm and toolmark expert testimony [are] the exception rather than the rule."  *Id.* at 1117.

In this case, Defendant seeks to present expert testimony from David L. Faigman, Dean and Professor of Law at the University of California College of Law, San Francisco, as to his scholarly opinion on the "foundational validity" and reliability of firearm and toolmark identification evidence.  Dean Faigman has a stellar *curriculum vitae*, having published many articles concerning different topics in various subject matter areas.  Scientific evidence has been a continuing point of emphasis in his scholarship.  Over twenty-five years ago, he wrote a book titled *Legal Alchemy: The Use and Misuse of Science in the Law* (W.H. Freeman & Co., 1999).  He is also a co-author of a leading treatise in this area.  *See* David L. Faigman, et al., MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (West/Thomson Publishing Co., 2023).  In his expert report, Dean Faigman describes himself as a leading scholar "on the subject of the use of

---

[3] Speaking on behalf of the Department of Justice, then Attorney General Loretta Lynch stated "[w]e remain confident that, when used properly, forensic science evidence helps juries identify the guilty and clear the innocent, and the department believes that the current legal standards regarding the admissibility of forensic evidence are based on sound science and sound legal reasoning. While we appreciate their contribution to the field of scientific inquiry, the department will not be adopting the recommendations related to the admissibility of forensic science evidence." Gary Fields, *White House Advisory Council Report Is Critical of Forensics Used in Criminal Trials*, THE WALL STREET JOURNAL (Sept. 20, 2016), https://www.wsj.com/articles/white-house-advisory-council-releases-report-critical-of-forensics-used-in-criminal-trials-1474394743.

scientific research and legal decision making," and as the "most-cited evidence scholar in the nation."  (Doc. 76-2 at ¶ 5).

Outside of his paper credentials, Dean Faigman has distinguished himself as a highly accomplished academic and a respected member of the law faculty at his institution, having been selected as Chancellor and Dean of the law school.  Specific to the field of forensic evidence, he has served as a peer reviewer for the proceedings of the National Academy of the Sciences and as a senior advisor to the 2016 President's Council of Advisors on Science and Technology, which prepared the PCAST report.[4]  Beyond the confines of academia, Dean Faigman has spoken and lectured on forensic evidence in a variety of forums, including at the National Judicial College in Reno, Nevada.

Dean Faigman clearly has much to say on the general topic of scientific evidence.  During the hearing on this motion, he tended to give lengthy answers that sometimes offered more information than called for by the question.  Nonetheless, he was personable, professional, courteous, and very knowledgeable.  As expert witnesses go, his demeanor was superb.

That being said, it must be recognized that Dean Faigman has never conducted a firearms examination and has no experience doing so.  He is not a

---

[4] The PCAST report criticized firearm and toolmark examination techniques, among other things.  However, the Court notes that following publication of the PCAST report, "multiple courts have found that the PCAST Report's chief concern—that, at the time of its publishing in 2016, insufficient studies existed on the validity of [firearm toolmark identification]—appears to now be out of date." *United States v. Pete*, No. 3:22cr48-TKW, 2023 WL 4928523, at *4 (N.D. Fla. July 21, 2023) (citing *United States v. Harris*, 502 F. Supp. 3d 28, 38 (D.D.C. 2020)); *accord United States v. Cloud*, 576 F. Supp. 3d 827, 845 (E.D. Wash. 2021) ("[S]ubsequent validation[] studies have addressed the most significant of the PCAST Report's concerns.").

practicing experimental scientist and has never conducted an experimental study in this area. His expertise in the area comes from his own more general scientific education (including a degree in experimental psychology) and his training in law, combined with many years spent reading the literature in this specific area and teaching, speaking, and writing about the subject. During the hearing on this matter, Dean Faigman reiterated that his expertise is based only on his review of the research literature, and that his testimony would be about the "whole field" of firearm and toolmark identification.

Dean Faigman is also admittedly not familiar with the specifics of how Pike performed his examination and reached his conclusions in this case. To that end, Dean Faigman would not provide testimony regarding the specific examination of the firearm in this case. Rather, he proposes to testify broadly as a scholar concerning the "foundational validity" of firearm and toolmark identification evidence in general, focusing on research studies that, as discussed below, may or may not be applicable to any issue in this specific case. He admitted that his sweeping declaration, provided as his expert report in this case, was a general document – not prepared for anything specific to this case – that broadly discusses his opinions as to the reliability of present-day firearm and toolmark identification. Additionally, a number of the points he makes in his expert report involve legal and policy considerations rather than purely scientific concerns. He is not being offered as an expert in the same field as Pike, the Government's expert. Instead, he is essentially being offered as an expert in a different but related field.

Dean Faigman's education, research, teaching, speaking, and writing about the various criticisms of the field of firearm and toolmark identification certainly suggest he might be qualified as an expert within the meaning of *Daubert* and Rule 702.  This does not mean, however, that his proposed expert opinions in this case do not present significant *Daubert* obstacles.  At least one commentator believes the type of expert testimony proposed by Dean Faigman would not pass muster under *Daubert*.  *See* Jim Agar, *The Admissibility of Firearms and Toolmarks Expert Testimony in the Shadow of PCAST*, 74 BAYLOR L. REV. 93, 131 (2022).  Indeed, Dean Faigman has never testified in a federal court as a trial witness in this area.[5]

Here, it is unclear whether Dean Faigman's proposed testimony could survive a *Daubert* challenge.  Even if it could, expert opinions are subject to exclusion on other grounds.  *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").  As will be discussed below, there is a great risk Dean Faigman's proposed expert testimony will confuse the issues, mislead the jury, and result in unfair prejudice.  As such, it is unnecessary for the Court to delve into the weedy details and nuances of *Daubert*

---

[5] According to Dean Faigman, he has testified in federal courts and state courts as part of defense pretrial *Daubert* challenges to government experts, and as a trial witness in state courts in California and Oregon.  It appears he has been excluded from testifying at trial in at least one federal case, although the information provided by the Government does not explain that district court's reasoning.  *See* (Doc. 76-1); *United States v. Brown*, No. 1:23-cr-242-SEG-CMS (N.D. Ga. Jan 19, 2024).

and its progeny to decide this motion. The Court will assume, without deciding, that Dean Faigman's proposed expert testimony meets *Daubert* requirements.

### *The Expert Opinions*

The focus of Dean Faigman's proposed expert opinions, which he has articulated in his highly detailed 29-page expert report, is that "mainstream academic scientists uniformly question the foundational validity of firearms identification." (Doc. 76-2 at ¶ 133). This general point – the unreliability of forensic evidence – has been a theme of Dean Faigman's academic work, in one form or another, spanning at least 25 years and is perhaps why he was selected to be a part of the presidential council that resulted in the PCAST report.

In his expert report, Dean Faigman repeatedly articulates very broad challenges to the entire field of firearm and toolmark identification:

> . . . firearms identification opinion evidence is not generally accepted among scientists. . . . it is unambiguously clear that mainstream academic scientists uniformly question the foundational validity of firearms identification; those accepting it are limited to those self-interested in accepting it. ¶ 133

> The core concern of this Declaration involves the question whether firearms identification expertise – a subject long assumed to be valid for courtroom use – possesses a methodological and statistical foundation adequate to support the opinion of expert witnesses in court. ¶ 13

> . . . The firearms expert claims to be able to identify the source of bullets and cartridge cases fired in this case. This opinion testimony is not supported by scientific studies and the underlying scientific theory and technique are not accepted as valid by the relevant scientific community. ¶ 15

> The fundamental proposition of this Declaration is that the validity of individualized judgments about the source of bullets or cartridge cases has yet to be demonstrated in the research literature. ¶ 116

(Doc. 76-2). Despite these rather broad pronouncements, at its most basic form, Dean Faigman's ultimate opinion appears to be that the "foundational validity" of

firearm and toolmark identification is questionable because the generalized error rate offered by firearms experts in general *might* be understated. He does not say the error rate *is* in fact wrong. Stated differently, he and others in the "mainstream academic scientific community" believe there is insufficient data to support the error rate offered by firearms experts.

This ultimate opinion is predicated on specific criticisms of the studies that firearms experts have historically relied upon to support their opinions, including: (1) the failure to count inconclusive results as errors when calculating the generalized error rate, (2) using volunteers as test subjects, (3) high attrition rates, or firearm examiners dropping out of the studies after they have begun a study, and (4) lack of pre-testing, or not understanding how difficult the identification task is. Faigman also criticizes the procedures used by examiners due to cognitive bias, or the unconscious or implicit tendency of the firearm examiner to see what he expected to see.

When attempting to fully understand Dean Faigman's proposed expert testimony, it his helpful to emphasize what he is not saying. He is not saying that (1) the error rate offered by the firearm expert in this case is *in fact* wrong; (2) the firearms examinations used by firearms experts produce a significant number of false positives, thereby helping convict innocent people; or (3) that the firearms test performed by the Government expert in this specific case was in any way inaccurate or unreliable.

*Risk of Confusion and Misleading the Jury*

If Dean Faigman were allowed to testify, the Court is convinced his opinions would confuse or mislead the jury. During the hearing on this matter, he disclaimed any plan to testify in terms of *Daubert* or other admissibility issues during the trial. But he also generally expressed in terms about what Andrew Pike can and "cannot" say about whether Pike's examination resulted in a match, and – significantly – on what the trier of fact "can rely on" when considering Pike's testimony and the toolmark evidence.[6] Dean Faigman indicated that he would testify that "whatever weight a trier of fact would put on that type of statement ought to be discounted and maybe dismissed altogether." As he put it, "[i]t's really about *Daubert*. *Daubert* said the methods and principles underlying the expert opinion have to be reliable and valid."

One of the most significant issues with the proposed expert testimony is that Dean Faigman purports to speak on behalf of the entire scientific community. The danger with this testimony, from a witness with Dean Faigman's experience and credentials, is that a jury will give it too much weight, be confused and interpret the testimony to mean that the entire scientific community has determined with one-hundred percent certitude that firearm identification is definitely unreliable and, therefore, the firearm identification evidence in this case should not be believed.

---

[6] For example, in his report, Dean Faigman identifies the "core concern" of his report as: "whether firearms identification expertise – a subject matter long assumed to be valid for courtroom use – possesses a methodological and statistical foundation adequate to support the opinion of expert witnesses in court." (Doc. 76-2, at ¶ 13). He states that "the operative question is what an expert should be allowed to say, given the state of the art of the technique." (*Id*. at ¶ 32).

Such an interpretation of Dean Faigman's testimony would be inaccurate and unfairly prejudicial to the Government. As noted, Dean Faigman's expert opinion, at bottom, is simply that the error rate offered by firearms experts in general *might* be understated. A broad opinion implying that the entire scientific community has determined that toolmark identification *is* definitely unreliable is very different from a narrow opinion that the error rate offered by firearms experts *might* be understated.

The Court has considered whether it could limit Dean Faigman's testimony in some way to allow him to testify about his concerns with error rates, but after a careful review of his expert report and testimony at the hearing in this matter, the Court has determined that (1) it would be impossible for Dean Faigman to stay within these limitations, and (2) even if limited, his proposed testimony on the error rate would also be confusing and risk misleading the jury under the circumstances of this case. For instance, Dean Faigman intends to discuss perceived issues with the measurement of the generalized error rate to support his opinion that the field of toolmark identification lacks foundational validity, discussing this particular issue at length.[7] (Doc. 76-2 at 11-21). He opines that "inconclusive" results should be included as errors but are currently excluded in the studies supporting the validity of firearm and toolmark identification, making it impossible to determine what the error rate associated with toolmark identification truly is.[8]

---

[7] Although he levels a few other criticisms at studies supporting the validity of firearm and toolmark identification, Dean Faigman testified at the hearing that the error rate was his main criticism.

[8] For example, as to one of the studies, Dean Faigman observed that when inconclusive results are counted as errors rather than omitted, the error rate produced by the study

Whatever the significance of these points in the abstract and for other purposes, a discussion regarding the inclusion or exclusion of inconclusive results from the calculation of the generalized error rate is not particularly probative with respect to the issues in this particular case where government expert Andrew Pike will testify that the examination resulted in a match.[9]  And Dean Faigman does not appear to have much concrete to say about the error rate as it pertains to false positive results.  *See* (*id*.) (recognizing that the Ames Laboratory study considered by PCAST reported a false positive error rate of 1.01% but noting that including any response other than an exclusion as an error would increase error rate to 33%); *United States v. Hunt*, 63 F.4th 1229, 1240 n.7 (10th Cir. 2023) (finding that "the Ames Study's false-positive rate furnishes the relevant error rate . . . because a false positive identification . . . is the type of error that could lead to a conviction based on faulty evidence." (internal quotation omitted)); *United States v. Harris*, 502 F. Supp. 3d 28, 39 (D.D.C. 2020) (reviewing eleven studies spanning 20 years with false positive rates between 0% and 1.6%).

To be clear, Dean Faigman does not assert that false positives are somehow being underreported nor does he raise any other issues with the error rate associated with false positives that are implicated by the facts of this case.  By

---

increases to "as much as a whopping 53%" for bullets and an "eye-popping 44%" for cartridges.
[9] In addition, the Court notes that discussion of a generalized error rate may not even be particularly meaningful or probative in this case given the subjective aspects of toolmark identification.  As reports and studies acknowledge, "error rate largely depends on [an] examiner's training and experience."  *See Pete*, 2023 WL 4928523, at *5.  Dean Faigman has not looked at the examination in this case and offers no particularized opinions as to any errors possibly made in this case.

opining on abstract issues with the generalized error rate and the treatment of inconclusive results, as well as a number of other matters discussed in his report such as cognitive bias, Dean Faigman very well may confuse or mislead the jury that is tasked with considering the credibility of a positive match, including whether that result may be a false positive.

Because of these issues, the Court concludes that Dean Faigman's proposed testimony would be confusing and misleading to the jury. Furthermore, as a practical matter, it would be impossible to limit his testimony in a way that would prevent this confusion.

### *Undue Weight*

The danger of juror confusion would be particularly amplified beyond all repair if a witness with Dean Faigman's status as a law professor, and distinguished position within the American legal system, were permitted to offer the proposed expert opinions contained in his expert report. When an expert witness who can legitimately be characterized as a leading scholar "on the subject of the use of scientific research and legal decision making," and as the "most-cited evidence scholar in the nation" makes a broad pronouncement in a trial that "mainstream academic scientists uniformly question the foundational validity of firearms identification," it is difficult to imagine how a jury would not give undue weight to that testimony. It would be impossible for a jury to question this broad pronouncement coming from a law professor and consider the fact that it is mostly, if not exclusively, rooted in a concern about underreported error rates. Moreover, his framing of various opinions and conclusions in terms that appear to involve

legal and policy considerations, rather than purely scientific concerns, would add another layer of juror confusion.

Based on his status and the type of testimony he intends to offer, instead of evaluating this testimony fairly and objectively, there is a substantial risk a jury will afford it "talismanic significance." Frankly, it is difficult to imagine an expert witness that would be given a greater degree of "talismanic significance" in the eyes of a jury on an issue such as this than Dean Faigman. No amount of cross examination or limiting instructions from the Court would be effective in clearing up this confusion.

Courts have recognized the danger posed by this type of testimony from this type of witness. For instance, in *United States v. Taylor*, 704 F. Supp. 2d 1192, 1198-1200 (D.N.M. 2009), the court excluded the expert testimony of a law professor who planned to offer criticisms of the entire field of firearm and toolmark identification. When excluding this type of witness, the district court in *Taylor* found the Eleventh Circuit's opinion in *United States v. Paul,* 175 F.3d 906, 909; 911-12 (11th Cir. 1999), to be particularly instructive. In *Paul*, the Eleventh Circuit affirmed the exclusion of the testimony of a law professor concerning the limitations of handwriting analysis after the district court concluded that such testimony would be confusing to the jury.

Furthermore, Dean Faigman's status as a law professor is likely to mislead the jury when he purports to give non-legal opinions about how much weight the jury should give the Government witness's testimony. As the Eleventh Circuit noted, a law professor's "skill, experience, training and education as a lawyer [do]

not make him any more qualified to testify as an expert on [forensic evidence] than a lay person who read the same articles." *Paul*, 175 F.3d at 912.

Finally, juror confusion would certainly result if Dean Faigman, as a law professor, provided testimony about evidentiary matters such as what the Government's expert may say during his testimony. It is the Court's duty to instruct the jury on what it may or may not rely on, not an expert witness who happens to be a law professor. This would, no doubt, cause juror confusion and a curative instruction would not remedy this issue.

## Conclusion

When all is said and done, Defendant wants to present an eminent law professor – who is himself neither a practicing scientist nor a firearms examiner – to offer what amounts to the verdict of what he deems the "scientific community" on the reliability of a firearms examination methodology that is more practical and observational than purely "scientific," a methodology regularly accepted by most courts throughout the country, including this one, as sufficiently reliable for a jury to consider. Ultimately, the risk of confusion and unfair prejudice to the Government *substantially* outweighs the probative value of this proposed testimony. It must be excluded at trial pursuant to Federal Rule of Evidence 403.[10]

---

[10] The Court notes that Dean Faigman's general critiques concerning firearm and toolmark identification are certainly appropriate for a pretrial *Daubert* hearing on the admissibility of firearms identification expert opinion testimony. But permitting this testimony during a jury trial would serve to confuse and mislead the jury. The Court further notes that many of the points that Defendant seeks to illustrate through Dean Faigman's testimony, such as criticisms of the generalized error rate of toolmark examinations due to the treatment of inconclusive results, may be made appropriately through vigorous cross examination of the Government's expert.

Accordingly, it is

**ORDERED**, **ADJUDGED**, and **DECREED**:

(1) The United States' "Motion in Limine to Preclude Testimony of Defense Expert Witness David Faigman" (Doc. 76) is **GRANTED.**

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 19th day of April, 2024, *nunc pro tunc* to April 12, 2024.[11]

TOM BARBER
UNITED STATES DISTRICT JUDGE

---

[11] On April 12, 2024, the Court entered an order granting the Government's motion, indicating that a written order would follow. (Doc. 115). This Order memorializes and explains the Court's April 12, 2024 ruling.